# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

CORNELE A. OVERSTREET, Regional
Director of the Twenty-Eighth Region of the
National Labor Relations Board, for and on
behalf of the NATIONAL LABOR
RELATIONS BOARD,

       Plaintiff

v.

DAVID SAXE PRODUCTIONS, LLC and V
THEATER GROUP, LLC,

       Defendants

Case No.: 2:18-cv-02187-APG-NJK

**Order (1) Granting Motion to Expedite,
(2) Granting Motion to Try the Petition on
the Papers, and (3) Granting in Part the
Petition for Temporary Injunction**

[ECF Nos. 1, 2, 3]

      Petitioner Cornele Overstreet, Regional Director for the National Labor Relations Board

(NLRB or Board), filed a petition for a temporary injunction against respondents David Saxe

Productions, LLC and V Theater Group, LLC under § 10(j) of the National Labor Relations Act

(NLRA). ECF No. 1.  David Saxe Productions (DSP) provides support services, such as human

resources, to entertainment related companies like V Theater Group, LLC (V Theater).  V

Theater operates the V Theater in the Planet Hollywood Miracle Mile Shops in Las Vegas.  As

relevant here, DSP and V Theater employ stagehands and lighting and audio technicians.

      In February 2018, some of the theater employees began to organize support to be

represented by the International Alliance of Theatrical Stage Employees and Moving Picture

Technicians, Artists, and Allied Crafts of the United States and Canada, Local 720, AFL-CIO

(the Union).  On April 26, 2018, the Union petitioned for a vote to become the exclusive

bargaining representative for certain theater employees. ECF No. 1-6 at 93.  The vote was held

on May 17. *Id.* at 98.  The majority of active employees voted against the union, but the outcome

is disputed because seven votes, which would change the result, were cast by employees who

were discharged before the election and thus not counted. ECF No. 1-6 at 145.  If the employees were unlawfully discharged, their votes would count, and the Union would become the employees' bargaining representative.  This case concerns events leading up to and following the vote.

From April through August 2018, the union filed numerous charges with the NLRB alleging DSP and V Theater had engaged in unfair labor practices. ECF No. 1-2 at 8-11, 16-18, 24, 28-30, 36.  The NLRB consolidated those charges into a complaint against DSP and V Theater. *Id.* at 40-49, 51-52, 54-71.  DSP and V Theater filed an answer, and that matter is pending before an administrative law judge (ALJ), who will make recommendations to the Board. *Id.* at 73-75, 77-79.

In the meantime, NLRB Regional Director Overstreet petitions for this court for a temporary injunction under § 10(j) of the NLRA against DSP and V Theater arising out of their alleged unfair labor practices.  Section 10(j) provides:

> The Board shall have power, upon issuance of a complaint as provided in subsection (b) charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order.  Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

29 U.S.C. § 160(j).  Injunctive relief in this context is designed "to protect the integrity of the collective bargaining process and to preserve the [NLRB's] remedial power while it processes the charge." *Avanti Health Sys., LLC*, 661 F.3d at 1187 (quotation omitted).  The remedy is meant to prevent someone from accomplishing an unlawful objective based on the delay between

the unfair labor practice and final resolution of the complaint process. *See Miller for & on Behalf of N.L.R.B. v. Cal. Pac. Med. Ctr.*, 19 F.3d 449, 455 n.3 (9th Cir. 1994) (en banc).

In determining whether temporary relief is just and proper under the circumstances, I "consider the traditional equitable criteria used in deciding whether to grant a preliminary injunction." *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1187 (9th Cir. 2011) (quotation omitted). Those criteria are: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm, (3) the balance of hardships favors the plaintiff, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Alternatively, under the sliding scale approach, the party seeking injunctive relief must demonstrate (1) serious questions on the merits, (2) a likelihood of irreparable harm, (3) the balance of hardships tips sharply in the moving party's favor, and (4) an injunction is in the public interest. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

The fact that the NLRB exercised its discretion to seek a § 10(j) injunction does not mean I must defer to the Board in deciding whether interim relief is appropriate. *Small v. Operative Plasterers' & Cement Masons' Int'l Ass'n Local 200, AFL-CIO*, 611 F.3d 483, 490 (9th Cir. 2010). However, I "should evaluate the probabilities of the complaining party prevailing in light of the fact that ultimately, the Board's determination on the merits will be given considerable deference." *Id.* (quotation omitted).

## I. Likelihood of Success on the Merits

To show a likelihood of success on the merits in a § 10(j) proceeding, the Regional Director must show a "probability that the Board will issue an order determining that the unfair labor practices alleged by the Regional Director occurred and that this Court would grant a petition enforcing that order, if such enforcement were sought." *Frankl ex rel. N.L.R.B. v. HTH*

*Corp.*, 693 F.3d 1051, 1062 (9th Cir. 2012) (quotation omitted). The Regional Director makes a "threshold showing of likelihood of success by producing some evidence to support the unfair labor practice charge, together with an arguable legal theory." *Avanti Health Sys., LLC*, 661 F.3d at 1187 (quotation omitted). "Conflicting evidence in the record does not preclude the Regional Director from making the requisite showing for a section 10(j) injunction." *HTH Corp.*, 693 F.3d at 1063 (quotation omitted).

Where, as here,[1] the Regional Director "seeks and receives approval from the NLRB before filing a § 10(j) petition, the Director is owed special deference because likelihood of success is a function of the probability that the Board will issue an order determining that the unfair labor practices alleged by the Regional Director occurred." *Avanti Health Sys., LLC*, 661 F.3d at 1187 (quotation omitted). "That the NLRB itself decid[ed] to file a Section 10(j) petition might signal its future decision on the merits, assuming the facts alleged in the petition withstand examination at trial." *Id.* (quotation omitted).

**A. Section 8(a)(1)**

Section 8(a)(1) of the NLRA makes it an unfair labor practice for an employer to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title." 29 U.S.C. § 158(a)(1). Section 157 gives employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ." *Id.* § 157.

Overstreet asserts that DSP and V Theater violated this section through three sets of acts: (1) granting a retroactive wage increase after learning of the union organizing efforts;

---

[1] The Board approved the § 10(j) petition on November 2, 2018. ECF No. 12-3 at 85.

1  (2) creating the impression that management was surveilling the employees' union activities; and

2  (3) directing employees not to engage in union activities and threatening them for doing so.

3         1.  Granting Benefits

4         Overstreet contends DSP and V Theater rushed through a retroactive raise for the

5  employees while they were considering union organizing as a way to convince the employees

6  they did not need the union.  DSP and V Theater respond that the wage increase came before the

7  union filed a petition for an election, so there was no offer of increased benefits during the

8  "critical period" between the petition and the election.  They also contend they had a legitimate

9  reason for the timing of the increase because former manager Jason Pendergraft had been

10 ordered to increase the employees' wages but failed to do so.  They argue there is no evidence of

11 a link between the wage increase and an effort to discourage union activities.

12        Granting benefits to employees in an effort to influence a union representation election is

13 an unfair labor practice. *NLRB v. Exch. Parts Co.*, 375 U.S. 405, 409 (1964).  "The danger

14 inherent in well-timed increases in benefits is the suggestion of the fist in the velvet glove.

15 Employees are not likely to miss the inference that the source of benefits now conferred is also

16 the source from which future benefits must flow and which may dry up if it is not obliged." *Id.*;

17 *see also NLRB v. Stephen Dunn & Assocs.*, 241 F.3d 652, 666 (9th Cir.2001) (stating that a

18 "wage increase (or grant of a benefit) designed to impact the outcome of a representation

19 election is a 'hallmark' violation of the NLRA and is as highly coercive in its effect as

20 discharges or threats of business failure" (quotation omitted)).  Thus, "conduct immediately

21 favorable to employees which is undertaken with the express purpose of impinging upon their

22 freedom of choice for or against unionization and is reasonably calculated to have that effect" is

23 an unfair labor practice. *Exch. Parts Co.*, 375 U.S. at 409.

Employers may justify the conferral of benefits before a representation election if they can overcome the presumption that the benefits were related to the pending election. *NLRB v. Anchorage Times Publ'g Co.*, 637 F.2d 1359, 1366-68 (9th Cir. 1981). "An important indicator of [the employer's] motive is whether there has been a change from the status quo." *Id.* at 1367. The timing of the wage increase and variations from the company's usual course of conduct can be evidence of improper motive. *Id.* at 1368; *see also Free-Flow Packaging Corp. v. NLRB*, 566 F.2d 1124, 1129 (9th Cir. 1978) ("In the absence of evidence demonstrating that the timing of the announcement of changes in benefits was governed by factors other than the pendency of the election, the Board will regard interference with employee freedom of choice as the motivating factor."). The employer bears the burden of establishing a "justifiable motive." *Free-Flow Packaging Corp.*, 566 F.2d at 1129.

Overstreet has shown a likelihood of success on this charge. The employees received a wage increase on March 14, 2018, the day after their second meeting with union representatives. No employees had heard they would be getting a raise prior to when they were given. ECF No. 1-3 at 82, 120. The raises came about when David Saxe, owner and president of DSP and president of V Theater, sent an email to payroll at 12:09 a.m. on March 14 directing an increase in wages for many employees retroactive for the prior week's pay. ECF Nos. 1-5 at 74; 1-6 at 9, 30-31. Payroll employees arrived at work at 8:30 a.m. and had to finalize payroll by 11:00 a.m. ECF No. 1-6 at 30-31. Thus, they had a very short time to process pay increases for numerous employees.

There is evidence that pay increases had been discussed for months among management and human resources personnel. *See* ECF Nos. 1-6 at 30-31; 11-16 at 38; 12-3 at 51-56. However, the timing of the wage increase raises an inference of improper motive. There is no

explanation as to why, the day after the employees held their second meeting with union representatives, there was a sudden need to rush through retroactive raises for the prior week's pay. Indeed, the fact that pay rates had been discussed for months suggests there was no urgent need to grant the raises retroactively. DSP and V Theater contend it was because Pendergraft was supposed to increase wages earlier and had failed to do so. But the Board could find that does not explain the coincidental timing and conflicts with evidence that after Pendergraft was terminated in late February 2018, DSP and V Theater were still discussing compensation structure, including paying a flat rate per show rather than a wage increase. ECF No. 12-3 at 56. There is no evidence that the employer had previously granted retroactive wage increases or that this was a regularly scheduled increase. Overstreet therefore has shown a likelihood of success on his claim that the wage increase was designed to discourage employees from supporting the union.

DSP and V Theater contend management did not know about the union organizing effort until April 9 or 10 and so could not have acted with anti-union animus when making decisions before then. *See* ECF Nos. 11-16 at 29-30; 11-18 at 10. However, there is evidence from which the Board may conclude otherwise, including that stage managers Thomas Estrada, Jr., Daniel Mecca, and Stephen Sojack knew about the union organizing effort early on; that Estrada expressed anti-union sentiment in February 2018;[2] that Estrada told his girlfriend, stagehand Courtney Kostew, that past organizing efforts ended in employees being fired; that Estrada saw an employee passing out union cards in February and told his supervisor, Tiffany DeStefano, about it; that Estrada and the other stage managers attended a meeting with upper management

---

[2] Estrada denies making the comments attributed to him. ECF No. 11-24 at 8. However, contrary evidence in the record does not preclude a showing of a likelihood of success on the merits.

on March 13; and that after or during that meeting, management requested volunteers for previously unscheduled painting and repair work to be done at the same time as the planned March 13 union meeting. *See* ECF Nos. 1-2 at 113, 129; 1-3 at 28-29, 107, 112-13; 1-4 at 81; 1-5 at 10-14, 23, 93-94, 97, 147-50; 1-6 at 6-7.

DSP and V Theater also argue they could not violate the NLRA by trying to sway the union vote because the complained-of actions took place before the union filed a petition for an election. However, the cases on which DSP and V Theater rely address when to set aside an election. *See R. Dakin & Co.*, 191 NLRB 343 (1971); *Sewell Mfg. Co.*, 138 NLRB 66, 70 (1962); *Ideal Elec. & Mfg. Co.*, 134 NLRB 1275, 1277 (1961). The "critical period" doctrine discussed in those cases does not preclude the possibility that an employer committed an unfair labor practice outside that time frame. *See Anchorage Times Pub. Co.*, 637 F.2d at 1365.

## 2. Creating the Impression of Surveillance

Overstreet contends DSP and V Theater created an impression that management was surveilling union supporters. Specifically, Overstreet contends Estrada told stagehand Alanzi Langstaff that he should not be seen talking to fellow employee and union supporter Zachary Graham. Second, Saxe told employees Josh Prieto, Darnell Glenn, and Scott Tupy that he knew they were pro-union and implied that Saxe had already lost their vote in the election. Finally, DeStefano sent a text message to employees the day before the election asking them to inform her whether and when they would be using company-supplied transportation to vote in the election. DSP and V Theater respond that these issues involve credibility determinations that ought to be resolved by the ALJ. They also contend DeStefano's text message was sent for logistical reasons and did not advocate a position on the vote or imply employer surveillance of the vote.

The NLRB "has long held that, when, in comments to its employees, an employer specifically names other employees as having started a union movement or as being among the union leaders, the employer unlawfully creates the impression, in the minds of its employees, that he has been engaged in surveillance of his employees' union activities." *In Re Royal Manor Convalescent Hosp., Inc.*, 322 NLRB 354, 362 (1996).

Langstaff testified that in late February he talked to Graham about joining the union. ECF No. 1-3 at 79-80. Estrada saw this conversation and told Langstaff that he should be careful about being seen talking to Graham. *Id.* at 80-81, 97-98. A couple of days before the election in May 2018, Saxe told Prieto, Glenn, and Tupy that he knew they were pro-union. ECF Nos. 1-3 at 117-19; 1-4 at 14-16, 48-50. Shortly before the election, DeStefano sent a text to employees who were not scheduled to work the day of the election advising that there was a shuttle at the theater that would take employees to the NLRB office to vote and return them to the theater. ECF Nos. 1-4 at 51; 1-6 at 38, 106. She asked for employees to tell her whether they would be taking the shuttle. ECF Nos. 1-6 at 103-06; 11-19 at 34-35.

Overstreet has shown a likelihood of success on this claim. Estrada's warning to Langstaff that he should not be seen talking to a known union supporter unlawfully creates the impression that management was surveilling the employees' union activities, and further carried with it the implication that being seen engaging in union activity would negatively impact the employees. Likewise, Saxe's comments to Prieto, Glenn, and Tupy that he knew they were pro-union suggested management surveillance of their union activities. Given that this comment was made after the mass firings but before the vote, the Board could conclude it carried with it an implied threat. While a close call, DeStefano's text message inquiring about who would use the company's shuttle to attend the vote may have created the impression that management was

keeping track of who was voting in the election.  Although the Board could also conclude that DeStefano's text was merely about logistics rather than surveillance, at this stage it is at least some evidence of surveillance.

### 3.  Directing Employees Not to Engage in Union Activities

Overstreet contends DSP and V Theater violated § 8(a)(1) when Estrada warned Langstaff not to be seen with Graham and when Estrada warned stagehands at a meeting to stop complaining because he had 15 peopled lined up to take their jobs.

An employer violates § 8(a)(1) by directing employees not to talk to anyone about the union or with anyone who was involved in the union. *See In Re Teledyne Advanced Materials & United Steel Workers of Am., AFL-CIO, CLC*, 332 NLRB 539 (2000).  Overstreet has shown a likelihood of success on this claim by presenting evidence that Estrada warned Langstaff not to be seen with Graham, who was distributing union materials.  This allegation is sufficient to support interim relief, so I do not address the allegation about Estrada's other comment.

**B.  Section 8(a)(3)**

Section 8(a)(3) provides that it is an unfair labor practice for an employer "by discrimination in regard to . . . tenure of employment . . . to encourage or discourage membership in any labor organization." 28 U.S.C. § 158(a)(3).  "An employer violates Section 8(a)(3) when the employee's involvement in a protected activity was a substantial or motivating factor in the employer's decision to discipline or terminate the employee." *HTH Corp.*, 693 F.3d at 1062. The Regional Director bears the initial burden of "showing that the employee was engaged in protected activity, the employer knew of such activity, and the employer harbored anti-union animus." *Id.*  If he does so, then "the burden shifts to the employer to demonstrate that it would have taken the same action regardless of the employee's union activity." *Id.*  "An employer

cannot prove this affirmative defense where its asserted reasons for a discharge are found to be pretextual." *United Nurses Ass'ns of Cal. v. Nat'l Labor Relations Bd.*, 871 F.3d 767, 779 (9th Cir. 2017) (quotation omitted).

Overstreet contends DSP and V Theater violated this section by (1) discharging nine employees for their protected activity, (2) reducing two employees' hours, and (3) delaying an employee's return from medical leave and then subjecting him to closer supervision upon his return.

### 1. Retaliatory Discharge

Overstreet contends DSP and V Theater discharged employees Taylor Bohannon, Nathanial Franco, Jasmine Glick, Kevin Michaels, Alanzi Langstaff, Leigh-Ann Hill, Michael Gasca, Chris S'uapaia, and Zachary Graham for their protected activities. Glick, Franco, Bohannon, and Graham were active members in a Facebook group chat the employees set up to discuss unionization. Graham, Glick, Franco, Michaels, and Bohannon solicited union support and invited employees to attend the March 13 meeting. All of these employees except Langstaff attended that meeting. Gasca was not involved in the union campaign but disclosed to DSP and V Theater during this time frame that he had been accepted to a union apprenticeship program. Overstreet argues this suggested to DSP and V Theater that Gasca was inclined to support the union. Additionally, Overstreet contends management knew who attended the March 13 union meeting based on who stayed after their shift to work on the impromptu repair project. For example, S'uapaia told Kostew that he could not stay, and Michaels left the repair project early to attend the meeting. Finally, Overstreet argues the timing of the discharges, along with the pretextual reasons for them, shows the discharges were retaliatory.

DSP and V Theater argue there is no evidence of anti-union animus and that they acted only out of legitimate business concerns. DSP and V Theater also argue that former manager Pendergraft failed to enforce policies or discipline employees for performance issues. Pendergraft was fired on February 21, 2018 after an audit confirmed he stole money and equipment. DSP and V Theater contend that during an investigation of Pendergraft's conduct, DeStefano discovered numerous cases of poor performance and misconduct by other employees that Pendergraft had not reported. DSP and V Theater assert that is why the employees were terminated en masse in March 2018. They also contend Hill and Graham were terminated on different dates for specific misconduct. DSP and V Theater maintain they were not aware of union activity until April 9, 2018, so terminations prior to that date could not have been retaliatory.

Overstreet has shown a likelihood of success on this claim because he has presented some evidence and an arguable legal theory for the employees' retaliatory discharges. There is evidence that these employees engaged in protected activity, including joining the Facebook chat, recruiting other employees for the union effort, attending union organization meetings, and handing out union cards at the theater. As discussed above, the Board has evidence from which it could find that management was aware of the union organizing activity before the discharges. Further, there is some evidence of anti-union animus, including Estrada's comments that prior unionization efforts had resulted in employees being fired and that he was going to put an end to the union effort.

DSP and V Theater have presented evidence that they would have taken the same action regardless of these employees' union activity. As discussed in more detail below with respect to whether reinstatement of these employees is a proper remedy, DSP and V Theater have

presented evidence of various performance failures, including tardiness and mistakes during shows.  DSP and V Theater also have presented evidence that following Pendergraft's firing, they were attempting to restructure the staff to ensure proper scheduling and to retain the best employees.  However, there is some evidence that the employers' reasons for these terminations were pretextual.  The timing of the discharges, both in relation to the union organizing effort and in relation to most of the employees being fired within days (and sometimes minutes) of each other, raises an inference of retaliatory intent.

### 2. Reducing Hours

Overstreet contends DSP and V Theater reduced the work hours of employees Darnell Glenn and Raymond Tupy in retaliation for their union support and that Saxe was aware of their union sympathies, as shown by his May 15 statement to them that he knew they were pro-union. Overstreet also contends the timing, along with the other evidence of anti-union animus, shows unlawful motivation.  DSP and V Theater assert that Tupy was properly disciplined for not adhering to the schedule DeStefano created and that part of the restructuring effort was to reduce hours because the theater was overstaffed.

Overstreet has shown a likelihood of success on the merits of this claim because he has presented some evidence and an arguable legal theory that the change in work schedules, which resulted in a reduction in work time, was retaliatory.  Tupy engaged in protected activity because he was a union member before he joined DSP and he fielded questions about the union from other workers. ECF No. 1-4 at 7-9.  Additionally, Tupy openly challenged comments made by the anti-union persuader brought in by management just before the vote. *Id.* at 9-12, 45-46. Glenn engaged in protected activity by attending the March 13 union meeting. *Id.* at 39.  Saxe

knew about Tupy and Glenn's activities, as shown by his comment before the vote that he knew they were pro-union.

Starting in early May, Glenn stopped getting called in early to do maintenance before shows. ECF No. 1-4 at 52-53. Additionally, both Tupy and Glenn had a regular start time of 7:30 p.m. for the 8:30 p.m. shows. ECF No. 1-4 at 22-25, 31-32, 54. But after the election, their scheduled start time changed to 8:00 p.m. *Id.* at 23, 54-55. Tupy nevertheless continued to show up and sign in at 7:30 because he needed to come in long enough before the audience was let into the theater at 8:15 to complete all of his pre-show tasks. *Id.* at 23-25, 31-32. Glenn complained to DeStefano that coming in at 8:00 did not allow him sufficient time to complete required equipment checks. *Id.* at 55-56. In response, DeStefano changed the start time to 7:45. *Id.* at 56. Tupy was disciplined on June 20, 2018 for clocking in at 7:30. ECF No. 1-6 at 149-50. According to the disciplinary document, DeStefano told Tupy that if he needed to come in early for a specific repair, he should let her know and get her approval before coming in early or staying late, but he persisted in coming in early without prior approval. *Id.*

The Board reasonably could conclude from the proximity to the election vote that Tupy and Glenn's start time was changed in retaliation for their union support. The Board also could conclude that management made them report to work so close to the time the audience entered the theater that it was impossible for them to complete their required work in the time allotted, thus setting them up for failure. That is not the only conclusion the evidence would support, but contrary evidence in the record does not preclude a showing of a likelihood of success on the merits.

/ / / /

/ / / /

### 3. Delaying Return from Medical Leave

Overstreet contends DSP and V Theater delayed employee Stephen Urbanski's return from medical leave, and then subjected him to more onerous work conditions and closer supervision upon his return to work. I need not address these issues because Urbanski has abandoned his job. ECF No. 11-43 at 25. I therefore will not award injunctive relief related to this employee.

## II. Irreparable Harm

A preliminary injunction may not be entered "based only on a possibility of irreparable harm." *Operative Plasterers' and Cement Masons' Int'l Ass'n*, 611 F.3d at 490-91. Instead, the party seeking relief must show irreparable harm is likely in the absence of preliminary relief. *Id.* "[P]ermit[ing an] allegedly unfair labor practice to reach fruition and thereby render meaningless the Board's remedial authority is irreparable harm." *Avanti Health Sys., LLC*, 661 F.3d at 1191 (quotation omitted).

Overstreet contends that the discharge of so many union supporters threatens to derail the union organizing process and chill other employees' support, thus warranting interim injunctive relief. DSP and V Theater respond that there is no irreparable harm because once the Board issues its final order, it can make whole any injured employee. They also contend there is no evidence that the employees want to be reinstated or that support for the union has been diminished or is likely to diminish in the future.

I reject DSP and V Theater's argument that the Board's ability to later make discharged employees whole means there is no irreparable harm. "[T]he discharge of active and open union supporters risks a serious adverse impact on employee interest in unionization and can create irreparable harm to the collective bargaining process." *Frankl v. HTH Corp.*, 650 F.3d 1334,

1363 (9th Cir. 2011) (quotation omitted).  Thus, "a likelihood of success as to a § 8(a)(3)

violation with regard to union activists that occurred during contract negotiations or an

organizing drive largely establishes likely irreparable harm, absent unusual circumstances." *Id.*

DSP and V Theater discharged nine active union supporters during the organizing

campaign.  The record shows that union activity increased between the first and second union

meetings, but then dropped off after the mass firings, as evidenced by a decline in the number of

union authorization cards signed and in employee attendance at union organizing meetings. ECF

No. 1-5 at 68-69.  Additionally, Kostew stated she was dropping out due to Estrada's comment

that prior organizing efforts had resulted in firings. ECF No. 1-5 at 93.  This diminished support

for the union is evidence that irreparable harm is likely absent a preliminary injunction.

## III.  Balance of the Hardships

DSP and V Theater argue that the balance of hardships tips sharply in their favor because

reinstatement of employees who were fired for cause violates the NLRA.  DSP and V Theater

also argue an injunction would infringe on First Amendment rights by (1) forcing association

with a union on employees who voted against it, (2) being based on non-coercive speech, and

(3) requiring the employer to post and read a copy of this order.  DSP and V Theater contend that

an injunction would cause irreparable harm because it would require them to reinstate employees

discharged for good cause, which will negatively impact the quality of shows at the theater and

would result in additional training and operational costs.  Finally, they contend Overstreet made

no showing that the discharged employees want or are able to return to work for DSP and V

Theater, and these employees' return would displace other employees.[3]

---

[3] DSP and V Theater also argue the discharged employees violated the ALJ's sequestration order
during the administrative hearing.  But so did DSP and V Theater's managerial employees.  The
ALJ presumably will address violations of her order.

## A. NLRA and Employees Fired for Good Cause

DSP and V Theater argue that Overstreet's request for reinstatement of the discharged employees is an end run around 29 U.S.C. § 160(c), which precludes the Board from requiring reinstatement of an employee who was discharged for cause. Overstreet responds that there is no conflict between § 160(c) and an order for interim reinstatement under § 10(j).

Section 160(c) provides that "[n]o order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause." That section does not apply here because § 160(c) governs the Board's findings and award of relief, including reinstatement. 29 U.S.C. § 160(c) (providing that if the Board finds an unfair labor practice, it must state its findings and take "affirmative action including reinstatement of employees with or without back pay"). It is in this context that § 160(c) states that the Board shall not order reinstatement of an employee who was suspended or discharged for cause. The Board has not determined that these employees were discharged for cause. Consequently, I am not precluded from granting interim relief in the form of reinstatement under § 10(j). *See Frankl ex rel. NLRB v. HTH Corp.*, 693 F.3d 1051, 1062 (9th Cir. 2012) (affirming district court's § 10(j) reinstatement injunction despite employer's argument that employee had been discharged for cause).

## B. First Amendment Rights

DSP and V Theater argue an injunction would infringe on First Amendment rights by (1) forcing association with a union on employees who voted against it, (2) being based on non-coercive speech, and (3) requiring the employer to post and read a copy of my order. Overstreet

responds that he is not requesting the union be recognized; rather, he seeks to restrain coercive

speech, and posting and reading of the order is an approved form of relief.

Overstreet does not request interim relief in the form of recognizing the union as the

employees' bargaining representative. Thus, my order will not force anyone to associate with

the union.

DSP and V Theater contend Saxe's statements to Glenn and Tupy were non-coercive and

non-threatening and so cannot support relief because Saxe had a right to express his views under

29 U.S.C. § 158(c). Section 158(c) "permits employers to express any views, arguments or

opinions concerning Union representation which contain 'no threat of reprisal or force or

promise of benefit.'" *NLRB v. Carilli*, 648 F.2d 1206, 1212 (9th Cir. 1981) (quoting 29 U.S.C.

§ 158(c)). However, as discussed above, Overstreet has shown a likelihood of success on his

allegation that Saxe gave an impression of surveillance by identifying those he knew to be union

supporters. Given that nine union supporters had already lost their jobs when Saxe spoke to

Glenn and Tupy just two days before the union election, the Board reasonably could conclude

there was an implied threat. Additionally, there is evidence that Estrada made anti-union

comments that were coercive, linking union support to negative consequences including possible

job loss. An employer does not have a First Amendment right to engage in coercive speech. *See*

*NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617 (1969); 29 U.S.C. § 158(c). Consequently, the

balance of hardships does not tip in favor of DSP and V Theater based on allegedly non-coercive

comments.

Finally, DSP and V Theater contend their First Amendment rights would be violated if

they have to post a copy of my order, deliver an electronic copy of my order to all employees,

and schedule a meeting where my order is read to employees. They argue this would force them

18

to "appear guilty despite a final determination on the merits, or supportive of the respective positions of Petitioner and the Union." ECF No. 11 at 17. Overstreet responds that courts routinely grant this remedy, as has the Board.

Courts have upheld reading an order as an "effective but moderate way to let in a warming wind of information and, more important, reassurance." *United Nurses Ass'ns of Cal. v. NLRB*, 871 F.3d 767, 789 (9th Cir. 2017) (quotation omitted). "Public notice reading in particular is designed to ensure that the important information set forth in the notice is disseminated to all employees, including those who do not consult the [employer's] bulletin boards." *UNF W., Inc. v. NLRB*, 844 F.3d 451, 463 (5th Cir. 2016) (quotation omitted). My order will not require DSP, V Theater, or any management personnel to read the letter aloud or email it to employees. Rather, the Board can read and email it. Moreover, it is obvious from this order that DSP and V Theater do not agree with or support the positions of the Petitioner and the Union. Finally, DSP and V Theater may disagree with my ruling or think it makes them look guilty, but "[n]othing in the NLRA protects an employer from the embarrassment it might experience as a byproduct of the Board's remedy." *United Nurses Ass'ns of Cal.*, 871 F.3d at 789. DSP and V Theater's First Amendment concerns therefore do not tip the balance of hardships in their favor.

### C. Reinstatement of Discharged Employees

I have considered DSP and V Theater's argument that reinstatement of discharged employees would impose burdensome training costs. However, these costs are unquantified, and the evidence shows employees receive on-the-job training that should result in little added training costs. See, e.g., ECF Nos. 1-3 at 94, 118, 129; 1-5 at 130; 1-6 at 76-77; 12-2 at 98-99. Additionally, the cues in a show sometimes change, so even long-time employees must be

retrained. ECF No. 12-2 at 96-97. Thus, I give little weight to training costs in the balancing of hardships.

As discussed in more detail below, the balance of hardships in relation to reinstating the discharged employees depends on the evidence related to each employee. Where there is stronger evidence of retaliatory discharge and pretext, the balance weighs in favor of interim relief in the form of reinstatement. Absent reinstatement, the union would face diminishing support through the firing of key union supporters whom the union would be unable to protect, thus further eroding support among the remaining employees.[4] *See Frankl ex rel. NLRB v. HTH Corp.*, 693 F.3d 1051, 1066 (9th Cir. 2012) (stating that termination of a known union supporter "sends a message that the employer will take action against union supporters, which adversely impacts employee interest in and support of unionization"). But where the evidence of pretext is weaker and the evidence of poor work performance is stronger, the balance weighs against reinstatement. If the Board finds all employees were unlawfully terminated, it can redress the violations as to those employees for whom I do not order reinstatement. The interim relief I award below is sufficient to address the concerns § 10(j) is designed to vindicate without requiring an offer of reinstatement to all discharged employees.

**IV. Public Interest**

DSP and V Theater assert that the public interest does not support an injunction because Overstreet delayed seeking an injunction for seven months; the hearing before the ALJ is complete, so the parties should await the ALJ's decision; and an injunction would displace the new employees. They argue I should allow the administrative process to run its course.

---

[4] I give little weight to whether the discharged employees want their jobs back. Requiring an offer of reinstatement is not just about making the discharged employees whole. It also sends a message to other employees that retaliatory discharges will be redressed.

Delay is a factor I must consider.  But "[d]elay by itself is not a determinative factor in whether the grant of interim relief is just and proper." *Aguayo*, 853 F.2d at 750.  The Board "needs a reasonable period of time to investigate and deliberate before it decides to bring a section 10(j) action." *Id.*  Consequently, delay is significant only "if the harm has occurred and the parties cannot be returned to the status quo or if the Board's final order is likely to be as effective as an order for interim relief." *Id.*

I have considered DSP and V Theater's argument that Overstreet unduly delayed seeking injunctive relief.  The parties can be returned to the status quo, and, given the delay inherent in the administrative process, the Board's final order is not likely to be as effective as interim relief. A more important consideration of the public interest in § 10(j) cases, however, "is to ensure that an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate the charge." *Small*, 661 F.3d at 1197 (quotation omitted).

Finally, in evaluating the reinstatement remedy, I give less weight to the interests of the newly hired employees.  The "rights of the employees who were discriminatorily discharged are superior to the rights of those whom the employer hired to take their places." *Aguayo for & on Behalf of N.L.R.B. v. Tomco Carburetor Co.*, 853 F.2d 744, 750 (9th Cir. 1988), *overruled on other grounds by Miller for & on Behalf of N.L.R.B. v. Cal. Pac. Med. Ctr.*, 19 F.3d 449 (9th Cir. 1994); *see also McDermott v. Ampersand Pub., LLC*, 593 F.3d 950, 965–66 (9th Cir. 2010) ("The rights of improperly discharged employees, assuming they were in fact wrongfully terminated, are superior to those of their replacements.").

/ / / /

/ / / /

/ / / /

**V.  Relief**

Overstreet has shown a likelihood of success on the merits, a likelihood of irreparable injury, and that the balance of hardships and the public interest favor interim injunctive relief.  I therefore consider what relief is just and proper under the circumstances. 29 U.S.C. § 160(j).

An injunction may be prohibitory or mandatory.  A "prohibitory injunction prohibits a party from taking action and preserve[s] the status quo pending a determination of the action on the merits." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878-79 (9th Cir. 2009) (quotation omitted).  In contrast, a "mandatory injunction orders a responsible party to take action." *Id.* (quotation omitted).  "A mandatory injunction goes well beyond simply maintaining the status quo [p]endente lite [and] is particularly disfavored." *Id.* (quotation omitted).  Generally, a court should not grant a mandatory injunction "unless extreme or very serious damage will result." *Id.* (quotation omitted).  A mandatory injunction is "not issued in doubtful cases or where the injury complained of is capable of compensation in damages." *Id.* (quotation omitted).

**A.  Prohibited Conduct**

I grant Overstreet's requested relief that DSP and V Theaters be enjoined from: (1) discharging, disciplining, or assigning more onerous work conditions in retaliation for union support or union activity; (2) granting benefits to induce employees to abandon union organizing; (3) creating the impression that employees' union activities are under surveillance; and (4) threatening employees with unspecified reprisals or job loss for supporting a union. These requests are supported by the evidence and require DSP and V Theater to do what the law already obligates them to do.  I decline to enjoin DSP and V Theater from soliciting grievances or promising to remedy them in order to discourage union activities and support.  The evidence

on this point was sparse and there was no evidence of any promise by DSP, V Theater, or their representatives to remedy grievances. *See* ECF No. 1-3 at 119, 131. Finally, I need not enjoin DSP and V Theater from interfering with employees' rights in any other manner. Should DSP and V Theater engage in other unfair labor practices, remedies exist to address such misconduct without resorting to a general prohibition in an injunction.

## B. Reinstatement

Overstreet requests that I order DSP and V Theater to offer reinstatement to discharged employees Zachary Graham, Kevin Michaels, Chris S'uapaia, Leigh-Ann Hill, Michael Gasca, Jasmine Glick, Alanzi Langstaff, Taylor Benavente Bohannon, and Nathaniel Franco.

### 1. Zachary Graham

I will order DSP and V Theater to offer reinstatement to Zachary Graham because the evidence of pretext related to his firing is particularly strong and there is no evidence his rehire would burden his employers with unsatisfactory performance. Graham engaged in union activities, including attending the February 28th meeting and speaking about the union with several other employees, including DeStefano and Estrada. ECF No. 1-2 at 130-36. On February 28, he spoke to DeStefano about family medical leave because he had broken his arm in an off-the-job incident. *Id.* at 133-34. According to Graham, DeStefano told him not to worry about it, that his job was safe, and he would have a job when he was healed. *Id.* at 134.

On March 21, DeStefano sent an email about Graham to Saxe in which she stated she did not receive proper paperwork from Graham regarding his medical leave and had not been able to contact him. ECF No. 1-6 at 90. She stated that she had decided to terminate his employment on March 1 because he would not respond to multiple efforts to contact him. *Id.*

That same day, DeStefano texted Graham stating that she had been trying to reach Graham for weeks without success. ECF Nos. 1-2 at 144; 1-6 at 86.  Graham responded within fifteen minutes that he had not received any texts or calls from DeStefano except the ones he received that day. *Id.*  DeStefano replied that she had asked Graham previously to provide a doctor's note but he did not do so, and he had not responded to her repeated calls or texts until now. *Id.* at 87.  DeStefano stated that Graham was "termed a while ago for job abandonment and failure to comply with the company policies & procedures." *Id.* at 87-88.  Graham's termination form states as reasons for his termination his failure to respond to multiple texts and phone calls and he did not show proof of a doctor's note following his arm being broken. ECF No. 1-4 at 65.

Graham testified, however, he had not missed any calls or texts from DeStefano. ECF No. 1-2 at 143-44.  His phone does not show any missed text messages from DeStefano between February 24 (when DeStefano asked for a doctor's note) and March 21 (when she stated she had been trying to reach him for weeks through calls and texts). ECF No. 1-6 at 86.   Other employees testified they saw Graham come to the theater several times during this period. ECF No. 1-3 at 7-8, 81.  On March 13, Graham went to the theater to talk to other employees about going to the meeting that night. ECF No. 1-2 at 135-36.

The evidence of pretext is strong.  DeStefano's claim that she could not reach Graham despite multiple attempts is belied both by Graham's testimony and his phone, which shows no missed texts from DeStefano.  Although DeStefano contends she could not contact Graham, other employees saw him in the theater on multiple occasions throughout March.  The evidence also shows Graham responded immediately to the March 21 text, suggesting he would respond to texts from DeStefano if she had actually sent him any.  DSP and V Theater present no evidence that Graham was an unsatisfactory employee, and he was not fired for poor job performance.  To

the contrary, in early February 2018, DeStefano ranked Graham as the fifth best stagehand out of twenty-one. ECF No. 1-6 at 63. DSP and V Theater therefore would not suffer hardship in having to reinstate him. To the extent they would suffer some harm, either through retraining or having to discharge a replacement employee, those harms are outweighed by the harm caused by Graham's retaliatory discharge. I therefore order DSP and V Theater to offer reinstatement to Graham.

## 2. Kevin Michaels

Michaels learned of the unionizing effort through Graham. ECF No. 1-3 at 5. Michaels spoke with other employees about the union and he attended the March 13 union meeting. ECF No. 1-3 at 8-10. On the day of that meeting, DeStefano informed Michaels of the repair and maintenance work to be done that night. ECF No. 1-3 at 11. Additionally, after that evening's show, Estrada started informing the employees about the repair work. *Id.* Michaels informed Estrada that he could stay only until midnight because he had something else to do. *Id.* Michaels left around midnight and went to the union meeting. *Id.* at 12. After that meeting, Michaels spoke to other employees at the theater about upcoming union meetings. *Id.* at 14.

DeStefano sent Saxe an email regarding Michaels on March 16. ECF No. 1-6 at 41. She stated that Michaels works hard but he has an attitude problem and would not follow DeStefano's schedule. *Id.* She also stated he was not willing to learn other jobs and brought down the morale of other employees because he did not seem to care about the job. *Id.*

The decision to fire Michaels was part of the mass terminations on March 15 and 16, although Michaels was not actually discharged until April 2. ECF Nos. 1-3 at 5; 1-5 at 109. That day, Michaels received a call informing him to contact the human resources department. ECF No. 1-3 at 17. He returned the call the next day and was told he was terminated for

25

insubordination, bad attitude, and poor work performance. *Id.* at 17-18. Michaels' termination form stated he violated company policies, "including insubordination, poor work attitude and poor work performance." ECF No. 1-4 at 66. According to DeStefano, Michaels was often tardy and once was late for the start of the show. *Id.* at 109-110. DeStefano stated that she spoke to Michaels multiple times per week since January about his tardiness and refusal to abide by the schedule. *Id.* at 110.

The evidence of pretext is strong. DeStefano reported that she had counseled Michaels numerous times in the early months of 2018. Yet Michaels was not disciplined until the decision was made to terminate him along with all of the other union supporters in mid-March 2018, within two days after Michaels left the impromptu repair project early to attend the March 13 union meeting. Additionally, Estrada, who was Michaels' supervisor, knew about Michaels' conduct and there is no evidence Estrada disciplined him for it. ECF No. 12-2 at 36-37. Approximately a month earlier, DeStefano had ranked Michaels as the seventh best stagehand out of twenty-one on the factors of "reliability, attitudes, etc.," despite his alleged chronic tardiness and refusal to abide by the schedule. ECF No. 1-6 at 63. Moreover, Michaels disputes DeStefano's statement that he was unwilling to learn other tasks, asserting that he had not been asked to do so and he in fact had suggested to Estrada in January or February that he and another employee learn a different task. ECF No. 12-2 at 34-35. Because the evidence of pretext is strong and the evidence of poor performance is weak, I order DSP and V Theater to offer reinstatement to Michaels.

### 3. Chris S'uapaia

S'uapaia first learned of the organizing effort on February 28 from another employee. ECF No. 1-3 at 67. On the night of the March 13 meeting, he attended a show at the theater as a

guest, instead of working it. *Id.* at 68-69.  After the show, Kostew asked him if he could stay and do the repair work, but he said he could not because he was there with his wife. *Id.* at 69.  After the show, S'uapaia went to the union meeting. *Id.* at 71.

DeStefano sent an email about S'uapaia to Saxe on March 15. ECF No. 1-6 at 39.  She stated he does not work much and calls off work to attend to other obligations. *Id.*  She also stated he would complain about doing tasks due to a prior injury and a fear of tripping.  She stated he was not a good fit for the company because it was getting harder to adjust to his availability and accommodations. *Id.* at 39.

Soon after S'uapaia arrived at work on March 19, DeStefano told him he was being let go. ECF No. 1-3 at 71-72.  DeStefano told him that the theater was going in a new direction with entirely new outside staff. *Id.*  S'uapaia asked about whether seniority would play into the decision about who would stay on board, but DeStefano did not respond specifically to that question. *Id.* at 72-73.  S'uapaia pressed DeStefano for more information, at which point she stated that she learned from Sojack that S'uapaia was unable to move backwards while doing his job because of a leg injury. *Id.* at 73.  S'uapaia responded that as long as he moves forward he can do his job, he just could not move backward because of his leg. *Id.*  DeStefano responded that if he could not do the job, then the company could not use him. *Id.*  DeStefano told him he also was being terminated "due to his shrinking availability," his calling out of work for no reason, and because the theater was restructuring and looking at various employees' performance. ECF No. 1-6 at 79-80.  S'uapaia's termination form states he cannot perform the job "to the fullest extent." ECF No. 1-4 at 64.  The form also states that he cannot walk backwards and "always has an excuse." *Id.*

The evidence of pretext is strong. S'uapaia's inability to move backwards while carrying items stems from a 2015 accident in which he broke bones and ripped muscles and tendons in his leg. ECF No. 1-3 at 74. DSP and V Theater had been accommodating his disability for several months. ECF No. 12-2 at 90-91, 100-02. There is no explanation as to why, in March 2018, it suddenly became an insurmountable problem for the company.[5] The timing is particularly suspect given that only days before, S'uapaia refused to stay for the repair work and instead attended the union meeting. Additionally, DeStefano gave shifting reasons for his termination. I therefore order DSP and V Theater to offer reinstatement to S'uapaia.

### 4. Leigh-Ann Hill

Hill learned about the union organizing effort in mid-February 2018 and she joined the Facebook chat group. ECF No. 1-3 at 27, 30. She also reached out to fellow stagehands about talking to union representatives. *Id.* at 27-28. On February 21, Hill invited stage manager Mecca into the Facebook chat group. *Id.* at 28, 37-38.

On March 1, Hill spoke to DeStefano about taking a few days off work so Hill could work on another project. ECF No. 1-3 at 30. DeStefano responded that was not a problem. *Id.* at 31. Hill then voiced concerns about work conditions, including low morale and insufficient wages. *Id.* Hill also complained that it was hard to work there because when she asked for things needed for her job, her requests were denied or delayed. *Id.* Hill told DeStefano it was time to make things better, that she was tired of being underpaid, and the job was the lowest-paying one she had had. *Id.* at 31-32. DeStefano replied that Pendergraft was recently fired and they would start working to make things better. *Id.* at 32. Hill then began yelling and cursing, at which point

---

[5] I do not address whether this is a legally valid reason for his termination under applicable disability laws, as that issue is not before me.

theater manager Michael Moore walked into the office. *Id.* at 32. Moore told Hill to be patient as they were trying to make things better. *Id.* Hill calmed down, apologized for cursing and yelling, and stated she understood they were working on it. *Id.*

That same evening, Hill went home and opened up the Facebook group chat. *Id.* at 32-33. She saw a message from Kostew stating that Hill was feeding information to DeStefano about the employees organizing. *Id.* at 33; ECF No. 1-4 at 103. Kostew made a comment about being worried that she would be fired for participating in union activities. ECF No. 1-3 at 33. Hill responded that that would be illegal. *Id.* at 33-34. Kostew then stated she did not want to be part of the union campaign any longer. *Id.* at 34. Hill removed Kostew from the group chat the next day, March 2. *Id.* at 34-35.

Hill was scheduled to work on March 2, but she received a call telling her she was terminated. *Id.* at 35. According to Hill, she was told her termination was due to restructuring and because Hill had obtained other employment. *Id.* at 35. Hill's termination form states she was fired for violating company policies and a poor attitude. ECF No. 1-4 at 58. However, human resources manager Takeshia Carrigan stated that a bad attitude was not a reason for Hill's termination. ECF No. 1-5 at 49, 55. According to Carrigan, Hill was terminated for trying to switch her schedule to accommodate a new job. *Id.* at 56. DeStefano later handwrote an additional reason on Hill's termination form: "+ secondary employment." ECF No. 1-5 at 45, 64-65.

The evidence of pretext is strong. DeStefano approved Hill's schedule change, so it would be puzzling for her to fire Hill on that basis. After DeStefano approved the change, Hill began to complain about working conditions at the theater. Hill was active in the Facebook chat group, so her complaints could have been construed as advocating for the union to come in and

assist employees with improving the situation. Additionally, there were shifting reasons for Hill's termination. Her termination form mentions a poor attitude, yet Carrigan testified that was not a reason for her termination. The form also mentions violation of company policies, but it is unclear what policy Hill violated. It was only later that DeStefano handwrote an additional reason on the form. Hill apparently performed her job well. *See* ECF No. 12-2 at 91 (Sojack stating Hill performed well). The defendants therefore would not be unduly burdened by having to reinstate her. I order DSP and V Theater to offer reinstatement to Hill.

### 5. Michael Gasca

Gasca was a part-time stagehand for DSP and V Theater. ECF No. 1-3 at 43-44. In October 2017, Gasca asked for time off in January and February to pursue a Teamsters Union apprenticeship program. *Id.* at 46. In December, the stage managers informed him they had not yet found someone to cover his time. *Id.* at 49-50. In January, someone from the company (Gasca could not recall who) called him and stated the company believed he had resigned. *Id.* at 50-51. Gasca explained that he had not resigned but he had asked for a leave of absence. *Id.* at 51. Gasca went to the theater to talk to Pendergraft, who told him they could not allow him to take time off, so they were going to let him go and rehire him later. *Id.* Gasca stated he did not want that and if the company needed him on an emergency basis, they could call him. *Id.* at 52. Pendergraft responded that he could put Gasca in an on-call position and Gasca agreed. *Id.*

Gasca was accepted into the apprenticeship program on February 26. *Id.* at 55; ECF No. 1-5 at 91. In early March, Gasca went to the theater to tell stage managers Sojack, Estrada, and Mecca that he had been accepted into the program. ECF No. 1-3 at 56. Gasca asked Sojack for more hours at the theater because the apprenticeship was unpaid. *Id.* at 58. Sojack referred

Gasca to DeStefano for scheduling. *Id.* at 59. DeStefano informed Gasca that she would see what she could do about getting him additional hours. *Id.*

That night, DeStefano called Gasca around midnight, but he missed the call. *Id.* at 59-60. Gasca went to the theater the next day, at which point DeStefano advised him he was terminated. *Id.* at 60-61. DeStefano told him he was a bad worker, had a bad attitude, and had no experience backstage. *Id.* at 61. DeStefano sent Saxe an email on March 16, 2018 stating Gasca was "mediocre" and he missed cues that affected the show performance. ECF No. 1-6 at 50. DeStefano wrote that Pendergraft agreed Gasca could be on call, but she did not agree with this decision because Gasca had a terrible attitude and constantly complained about his pay and hours. *Id.* DeStefano stated she no longer needed employees on call and Gasca's bad attitude may affect the morale of other employees. *Id.* Gasca's termination form stated his attitude was "awful and he was always complaining about hours/pay." *Id.* at 63. It also stated he took a leave of absence but "now wants hours." *Id.* Finally, the form states he "[m]essed up shows a lot." *Id.*

The evidence of pretext supports reinstatement. DeStefano initially told Gasca she would see what she could do about getting him more hours. Instead, she fired him. The Board could find her comments about Gasca's poor attitude, specifically that he complained about hours and wages, is code for union support. The Board likewise could find her comment that Gasca's poor attitude would affect the morale of other employees was code for encouraging other employees to support the union.

There is some evidence that Gasca's performance was subpar. *See* ECF Nos. 11-40 at 6 (Mecca stating Gasca's performance was not stellar because he would miss cues and socialize with the cast instead of paying attention to his job); 11-41 at 3 (Sojack stating Gasca's performance varied over time, as he missed cues and may have been disciplined for lateness).

However, DSP and V Theater had previously tolerated Gasca's uneven performance. Indeed, management previously was concerned about not having Gasca around when he requested a leave of absence. That does not suggest his performance was so poor that discharge was inevitable regardless of his union support. I order reinstatement of Gasca.

### 6. Jasmine Glick

Glick was a member of the Facebook chat group. ECF No. 1-2 at 115, 117. She attended the first meeting with union representatives on February 28. *Id.* at 117. After that, she spoke to several other employees about their interest in unionizing. *Id.* at 118-19. She had some of these conversations at work, but she tried to avoid cameras that management had placed in the theater. *Id.* at 114-15, 118. Glick also attended the March 13 union meeting. *Id.* at 120.

DeStefano sent an email to Saxe on March 15, 2018 stating that Glick was often not at work when asked, had a bad attitude, bad mouthed the company, was lazy, and was constantly on her phone. ECF No. 1-6 at 37. DeStefano stated that due to prior management, Glick had not been written up for her alleged performance failures. *Id.*

After Glick worked her shift on March 18, she received a call from DeStefano at 11:30 p.m. *Id.* at 121. DeStefano told Glick that the company was going to be restructuring and that Glick was terminated. *Id.* at 122. Glick's termination form states that she has a "long history of insubordination & attitude. Due to previous management she was never written up & always let off the hook for the awful things she has said & done. Her job performance was never putting shows first . . . ." ECF No. 1-4 at 59.

The evidence of pretext supports reinstatement. The timing of Glick's termination coincides with the discharge of other union supporters. Additionally, DeStefano told Glick she was being fired due to restructuring, but the termination form refers to a bad attitude and

insubordination. The reference to a bad attitude could be code for Glick's union activities. DeStefano gave no details about the supposedly "awful things" Glick said and did. Further, it is unclear why, if Glick had a long history of insubordination, her termination was suddenly necessary in March, just days after Glick attended the March 13 union meeting.

There is evidence Glick was not a perfect employee. She admitted she used her cell phone while on duty even after all employees had been told more than once not to use their phones at work. ECF No. 11-11 at 8-9. She also admitted that in her last month of work she was late at least four times. *Id.* at 10. I nevertheless conclude that the evidence of anti-union motive and pretextual reasons for termination support reinstatement for this employee. Should Glick return to work and continue to use her phone while on duty after having been told not to, DSP and V Theater are free to discipline her for violating company policies so long as that discipline is not motivated by anti-union animus.

### 7. Alanzi Langstaff

Langstaff learned about the organizing effort from Graham in late February. ECF No. 1-3 at 78-79. In either late February or early March, Estrada saw Langstaff and Graham speaking outside the Saxe Theater in the parking garage. *Id.* at 80, 97-98. As Langstaff re-entered the theater, Estrada told him to be careful being seen talking to Graham. *Id.* at 80, 97.

After Graham broke his arm in February, Estrada announced that Kostew would take over cue calling. ECF No. 1-3 at 84, 87-88. Langstaff requested to meet with DeStefano over this change. *Id.* at 85. Langstaff told her that he believed there was a conflict of interest in Estrada promoting Kostew as cue caller given that Kostew was Estrada's girlfriend. *Id.* at 85. DeStefano responded that it was her idea. *Id.* DeStefano then asked Langstaff if he was

33

interested in getting more hours, and he said he was. *Id.* at 85-86.  She said she would see what could be done about that. *Id.*

DeStefano sent an email to Saxe on March 16, 2018 documenting reasons to terminate Langstaff. ECF No. 1-6 at 35.  She stated Langstaff had problems with timeliness, work ethic, attitude, and performance, including an unwillingness to stay after shows to work on maintenance. *Id.*  She also stated he was screaming and arguing with another stagehand, Ivan Barrera. *Id.*  And she mentioned Langstaff's complaint about favoritism. *Id.*  DeStefano noted that she did not have documentation of his poor performance because of prior management's unwillingness to supervise and discipline employees. *Id.*

Langstaff was scheduled to work on March 16, 2018 but did not work that day due to a medical situation that required him to spend the night in the hospital. *Id.* at 88.  On the 19th, Carrigan called Langstaff and told him he was being let go due to restructuring and because they were bringing in an outside source for employees. *Id.* at 90-91.  Langstaff later talked to DeStefano who said the same thing. *Id.* at 91.  His termination form states he had "poor job performance all around," including problems with "timeliness," was "not the hardest worker," and was "lazy." ECF No. 1-4 at 62.  The termination form also stated Langstaff had a "[v]ery poor attitude." *Id.*

Although this is a close call, an order of reinstatement is just and proper under the circumstances.  Langstaff was part of the mass firing of union supporters in mid-March.  The reasons for his termination shifted, suggesting pretext.  He was told his termination was due to restructuring and an outside source for employees but his termination form mentioned job performance issues.  Among those issues was a "poor attitude," which may be code for union support.  Langstaff was disciplined in January for tardiness. ECF No. 11-28.  However, there

does not appear to be any particular incident or performance failure linked to his termination in mid-March.  While DSP and V Theater contend the timing is explained by Pendergraft's termination and DeStefano holding employees to a higher standard, there is evidence from which the Board could conclude otherwise.

I am hesitant to order an employer to reinstate an employee who allegedly intimidated a fellow employee.  In August 2017, Langstaff was involved in an incident with another employee, Ivan Barrera, who still works at DSP and V Theater. ECF No. 11-14.  Barrera testified he had a dispute with Langstaff about how Langstaff handed set pieces to him. ECF No. 11-13 at 3. Langstaff (who is a large individual) approached Barrera (who is much smaller) in an aggressive manner. *Id.* at 4.  Langstaff asked Barrera why he was acting like a "little bitch" and complaining about him to managers. *Id.* at 6.  Barrera responded by telling Langstaff that if he had an issue, he should speak to a manager. *Id.* at 7.  Langstaff continued berating Barrera, so Barrera told Langstaff to stop handing off the set pieces in such an aggressive manner that it risked injury to Barrera. *Id.* at 9.  Estrada came over and broke up the argument. *Id.* at 9-10.  Langstaff later re-initiated the argument as Barrera was leaving for the evening. ECF No. 11-14.  Another employee broke up that argument. *Id.*  After the incident, when the two interacted at work Langstaff told Barrera he was going to get slapped, challenged him to go "man to man," and engaged in other intimidating tactics. ECF No. 11-13 at 13-18.

This testimony is concerning.  However, DSP and V Theater retained Langstaff long after this incident, and this is not mentioned as a reason for his termination.  Consequently, his conduct towards Barrera did not impact his employment status.  The evidence of anti-union motive and pretextual reasons for termination therefore support reinstatement for this employee. Should Langstaff return to work and continue to engage in inappropriate behavior, DSP and V

Theater are free to discipline him so long as that discipline is not motivated by anti-union animus.

### 8.  Taylor Bohannon

In early February 2018, Bohannon joined the Facebook group chat. ECF No. 1-2 at 87. Bohannon also attended five meetings regarding unionization, the first in late February. *Id.* at 87-88.  After the first meeting, DeStefano discussed with Bohannon reducing Bohannon from full time status to part time because Bohannon had just returned to work following surgery. *Id.* at 89-90.  Bohannon attended a second union meeting on March 9th. *Id.*

DeStefano wrote an email to Saxe on March 15 indicating she had received a few complaints about Bohannon when Bohannon had first started, but that DeStefano had not heard anything since then until recently, when someone complained Bohannon was not very good. *Id.* ECF No. 1-6 at 46.  She also stated that Bohannon was not "horribl[y] screwing up," but was merely adequate, and that was insufficient. *Id.*  DeStefano added in another email that she heard from the cast that the show is "getting worse" with Bohannon, although no specifics were provided. *Id.*

Two days later, DeStefano left a phone message for Bohannon, which Bohannon responded to the next day. ECF No. 1-2 at 93.  DeStefano told Bohannon that her position was being terminated due to restructuring. *Id.*  She also told Bohannon that the termination was not due to tardiness or being insubordinate but that there were some concerns about how Bohannon had run a show. *Id.* at 93-94.  Bohannon's termination form states she was "unable to execute her shows properly," they received complaints from cast members and producers, and she reduced the quality of shows. ECF No. 1-4 at 61.

Although Overstreet has shown a likelihood of success on the merits that Bohannon's termination, as part of the mass terminations in mid-March 2018, was animated by anti-union motive, I do not find reinstatement a just and proper remedy. Bohannon admitted that she was told on more than one occasion that she was missing cues. ECF No. 11-9 at 3-4. The evidence of pretext is weaker with Bohannon because shortly before Bohannon's termination, DeStefano and Saxe received complaints about her from performers in the shows. ECF No. 11-10 at 3 (testimony of a performer indicating that Bohannon did not know how to run the show and if something went wrong, she could not fix it and would have to call a full-time audio technician for help). That performer complained to Saxe about Bohannon's performance in late February or early March. ECF No. 11-16 at 3-4. Other performers also complained to Saxe about Bohannon. *Id.* at 4. The performers are not involved in the union campaign and are not theater management. Thus, their complaints about Bohannon's work are particularly credible in this context because they have no motive to paint Bohannon in any particular light.

I decline to order DSP and V Theater to offer reinstatement to Bohannon. Because I am ordering DSP and V Theater to offer reinstatement to seven of the nine terminated employees, and (as discussed below) to restore the schedules of Tupy and Glenn, the purposes of granting § 10(j) relief are sufficiently vindicated without requiring DSP and V Theater to hire an employee about whom they received numerous complaints from performers. With respect to this employee, the balance of hardships tips in favor of the employer.

### 9. Nathaniel Franco

Franco joined the Facebook chat group and attended two union meetings in March. ECF No. 1-2 at 101-03. Outside the meetings, Franco spoke to other employees about possibly unionizing. *Id.* at 104-05.

DeStefano sent Saxe an email on March 14, 2018 stating that she had recently received complaints about how Franco ran sound for a show, that he missed cues, and that he tended to play the wrong music for certain acts. ECF No. 1-6 at 52. She wrote that prior complaints had been made about Franco to Pendergraft, who responded that Franco would be trained on the matter. *Id.* DeStefano stated that Franco has obtained almost double the training of other employees, but he was still making mistakes. *Id.* Saxe responded the next day that Franco should be terminated as soon as DeStefano found a replacement. *Id.* at 52-53. That evening, DeStefano reported to Saxe that Franco played two incorrect announcements in that night's show. *Id.* at 53; *see also* ECF No. 11-18 at 32-34.

On March 18, after Franco's shift was over, DeStefano spoke with Franco on the phone and advised him he was terminated. *Id.* ECF No. 1-2 at 105-06. Franco's termination form states he was fired because was "unable to execute shows," there were complaints from cast members, and he made mistakes during shows. ECF No. 1-4 at 60.

I do not find reinstatement is a just and proper remedy for similar reasons as discussed with respect to Bohannon. Franco admits that prior to his termination he was advised on more than one occasion that he played the wrong music during a show. ECF No. 11-12 at 6. He admits it disrupted the show and the audience could tell there was a mistake. *Id.* at 7. Indeed, Franco himself described one incident as a "disaster." *Id.* at 9-10. I therefore do not order DSP and V Theater to offer reinstatement to Franco.

### C. Restore Work Schedules

Overstreet has shown a likelihood of success on its claim that Tupy and Glenn's schedules were changed due to their union support. DSP and V Theater have not identified any hardship they would suffer from returning Tupy and Glenn to their prior schedules, which is only

fifteen minutes earlier than their current schedule.  If anything, Tupy and Glenn's testimony demonstrates that DSP and V Theater will benefit from having these employees arrive at work early enough to complete their pre-show tasks prior to the audience entering the theater and the show beginning.  I therefore grant this interim relief.[6]

**D.  Removing Discipline from Employee Files**

Overstreet requests that I order DSP and V Theater to remove from the discharged employees' files all references to their firing.  He also requests that I order DSP and V Theater to remove from Tupy's file the June 2018 discipline.  I deny this request because such interim relief is unnecessary.  The Board will resolve whether the employees were discharged or disciplined in retaliation for their union activities.  Purging the files now is premature, especially if the Board finds the discharges and discipline were justified.

**E.  Posting, Emailing, and Reading the Order**

I grant a mandatory injunction requiring DSP and V Theater to (1) post copies of this order at the workplace and allow the NLRB access to the workplace to monitor that this has been done, (2) hold a mandatory meeting at which specific portions of this order will be read aloud to bargaining unit employees, (3) email this order to employees or give the Board the employees' email addresses so the Board can email it, and (4) submit an affidavit saying these things have been done.  The Ninth Circuit has approved the remedy of a mandatory meeting to read a Board order to employees. *United Nurses Ass'ns of Cal.*, 871 F.3d at 788-89.  A reading is not "an extraordinary remedy." *Id.*  Rather, it as "an effective but moderate way to let in a warming wind of information and, more important, reassurance." *Id.* (quotation omitted).  In *United Nurses*, the

---

[6] Overstreet does not request relief related to Glenn's claim that he no longer is called in early for maintenance and repairs.  I therefore do not address that issue beyond it being evidence that DSP and V Theater retaliated against Glenn for his union support.

Ninth Circuit concluded a reading order "was clearly warranted in light of [the employer's] several unfair labor practices, including its retaliatory firing of a prominent Union supporter." *Id.* Thus, although a reading order is in a sense mandatory injunctive relief, it is not particularly burdensome and is meant to remedy the harm caused by the unfair labor practices in undermining employee confidence in the union. If DSP and V Theater do not want to read the order, a Board representative can do so. Likewise, if DSP and V Theater do not want to email the order, they may provide the Board with the employees' email addresses, and the Board may email the order to the employees.

**VI. CONCLUSION**

IT IS THEREFORE ORDERED that petitioner Cornele A. Overstreet's motion to expedite **(ECF No. 2)** and motion to try the petition on the papers **(ECF No. 3) are GRANTED**.

IT IS FURTHER ORDERED that petitioner Cornele A. Overstreet's petition for temporary injunction **(ECF No. 1) is GRANTED in part**.

IT IS FURTHER ORDERED that, pending completion of the underlying administrative proceedings before the Board, respondents David Saxe Productions, LLC and V Theater Group, LLC are hereby **RESTRAINED AND ENJOINED** from:

1. Discharging, disciplining, reducing the hours of, assigning more onerous working conditions to, or otherwise discriminating against employees because of their union support, union activity, or other activity protected by Section 7 of the National Labor Relations Act;

2. Seeking to induce employees to abandon their organizing activities by granting them benefits including wage increases and promotions;

3. Creating the impression that employees' union activities are under surveillance; and

4.  Threatening employees with unspecified reprisals or job loss for engaging in protected, concerted activity or supporting a union.

IT IS FURTHER ORDERED that respondents David Saxe Productions, LLC and V Theater Group, LLC shall:

A.      Within 10 days of the date of this order, offer Zachary Graham, Kevin Michaels, Chris S'uapaia, Leigh-Ann Hill, Michael Gasca, Jasmine Glick, and Alanzi Langstaff, in writing, immediate reinstatement to their former jobs, or if those jobs no longer exist, to substantially equivalent positions of employment, without prejudice to their seniority and other rights and privileges previously enjoyed, displacing if necessary any workers hired or transferred to replace them.

B.      Within 10 days of the date of this order, restore Scott Tupy and Darnell Glenn to their former work schedules.

C.      Within 10 days of the date of this order, post copies of this order at all theaters at the respondents' facilities at which bargaining unit employees[7] are employed, where notices to employees are customarily posted, and at each of the time clocks that employees use, and maintain these postings free from all obstructions and defacements during the pendency of the Board's administrative proceeding.

D.      Within 10 days of this order, either (1) email a copy of this order to all bargaining unit employees at the email address that the respondents use to communicate work matters to employees, or (2) provide the email addresses of all bargaining unit employees to the Board so the Board may email the order to the employees.

---

[7] By bargaining unit employees, I mean those employees who would fall within the unit identified in the stipulated election agreement. ECF No. 1-6 at 99.

E.  Within 10 days of this order, hold a mandatory meeting or meetings during working time at the respondents' facilities, at which the following portions of this order are to be read aloud: page 1 line 1 through page 3 line 18; page 22 lines 2-4; and page 40 line 10 through the end of the order.[8]  Those portions are to be read aloud by a responsible management official in the presence of an agent of the Board, or at the respondents' option by an agent of the Board in that official's presence.  It shall be read aloud to all employees in the identified bargaining unit, including at multiple meetings as necessary to ensure that the order is read aloud to all bargaining unit employees.[9]  The employees also shall be told that my findings are set out in full in this order, which they can read in the posted and emailed copies.

E.  Within 21 days of this order, file with the court and submit a copy to the Regional Director for Region 28 of the Board a sworn affidavit from a responsible agent of the respondents stating, with specificity, the manner in which the respondents have complied with the above terms of this order.

DATED this 24th day of January, 2019.

ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE

---

[8] This order is quite lengthy, so I will not require a full reading aloud.  The order will be posted and employees will receive an electronic copy, so they may read the details for themselves.

[9] If the employees work on different shifts, the respondents shall hold a sufficient number of meetings to accommodate those different schedules.